Frederick Brody for New York DEC. FERC's decision rests on the legal premise that any application form, however incomplete, commences the one-year period for state review under Clean Water Act section 401. FERC's interpretation would make section 401 dysfunctional. First, section 401 expressly requires public notice, allowing public notice to go forward without a complete application could deprive the process of meaning because important details could be withheld. Second, FERC's interpretation would allow applicants to game the system by submitting a fragmentary application to start the clock and then sandbagging DEC with a large supplement later in the process. Under FERC's interpretation, the if you simply text a blank application form with a project's name on it, that cannot be the law. Requiring DEC to deny incomplete applications without prejudice, which is the alternative urged by FERC and Millennium, would make matters worse. First, it would prevent DEC from working with applicants constructively to cure deficiencies in the application. Instead, to preserve its one-year review period, DEC would have to deny incomplete applications immediately. Second, every denial would be reviewable in this court. If this court finds an application complete, if the one-year period elapses during judicial review, which it well may, that applicant will have successfully avoided DEC review on the merits, as well as avoiding public notice and comment. You're saying that your client is entitled to Chevron deference for its interpretation of the statute. Is that correct? We have argued that in the brief, yes. Could you cite any decision in which a federal court of appeals has afforded Chevron deference to a state agency's interpretation of a federal statute when that interpretation has not been adopted or affirmed by the relevant federal agency? In the city of Bangor case, 532F3rd, the First Circuit held that the agency's interpretation there should receive some deference because the agency had some expertise in conducting water quality review. Back on the issue of the court's interpretation, it should construe Section 401 de novo. And on a de novo review, you look at the two interpretations, and you find that FERC's interpretation is subject to the fatal calamities that I've been describing, which is that the   I'm having trouble understanding some of those calamities and why. I mean, the department has the practice in certain circumstances of deeming an application withdrawn, I understand from your brief, and of deeming it incomplete, as it seems to have done under a couple of circumstances here. You say that the possibility of the applicant sandbagging the agency is clear, that what would happen is that the applicant would wait until the day before the one-year mark arrived at and then demand a decision. I don't understand why a denial at that point on the application would be seen by any court as arbitrary and capricious, why that wouldn't be upheld. In what respect would the agency be put in an untenable position if that happened? Well, we can't deny it on the merits on that hypothetical because we haven't had a chance to look at the record. But the statute... I think you could. I mean, I don't understand why you couldn't, in fact. I mean, that's kind of what would work out in other circumstances, is you say we're denying it and you may resubmit. You're denying without prejudice to resubmission and to further conversations back and forth, as you have done with other parties. Why is that not a reasonable way to proceed? Well, we can't deny anything on the ground that, well, we haven't gotten around to reading the whole record. There's nothing in the statute that allows that. Now, with respect to denials without prejudice, again, that regime, number one, you would have you wouldn't be able to work with the applicants because you just have to say, oh, there's an application. If we want a year to look at this and it appears to be incomplete, we just have to deny it right away. Otherwise, that year is going to be running while we're sitting on the application. And then every denial would be reviewable in this court, and that would... I mean, there are equitable principles at play as well, and Congress has expressed itself fairly clearly that a year was the outside period after a receipt of a request. And, in fact, it wasn't even clear to me from the documents I've seen that the department considers the application to have ever become complete because the letter, the Berkman letter from in November saying in August 31, I guess, 2017, we will treat it as complete, said we have at least this period to review it. It was still ambiguous. Are you clear that the application was complete as of that time? That is clear. There is a notice of complete application in the record, and I believe it is sometime in July of 2017 that there is that notice. Now, you may ask, why was there such a wait between the notice, the second notice, I'm sorry, the Berkman letter in November of 2016 and then the notice of complete application? Well, you have to look at the chronology. Shortly after the Berkman letter in December of 2016, Millennium petitioned for review in the D.C. Circuit. And we didn't get a decision from the D.C. Circuit until June 23, 2017. And then promptly thereafter, it was July 5, 2017, we provided public notice that the valuelateral application was complete. And you'll find that notice, Your Honor, on page 639 of the joint appendix. Now, a point I want to make additionally about denying incomplete application seriatim, if I may. Please. I see the red light is off. You've been given a little extra time already. Go ahead. I appreciate that, Your Honor. Denials without prejudice would not save time. Water quality review requires extensive information, and that information often comes from the applicant in phases. If anything, serial denial of repeated applications. Application comes in, we look at it quickly, it's missing something, we say, okay, denied. Then they have to redo the application, the application goes in again, and then we have to look at it again, and it's denied again. That would take at least the same amount of time as it does to sit down with the applicant and say, okay, let's discuss what we need and what you have, and let's work on how you can get us what we need to let the applicant know. But you have, in fact, used a deemed denied mechanism in some circumstances. Isn't that correct? Well, in Constitution pipeline, it was agreed with the applicant that they would withdraw and then resubmit. And they agreed to do that twice. In national fuel gas, the parties agreed to stipulate to a date of a deemed date when the application would be deemed submitted. Now, both of those went forward in that manner by agreement of the parties. We didn't have agreement of the parties here. Millennium was not willing to do that. That's in the record in one of their letters. So at that point, why don't you just deny? You just deny. You make a determination that you haven't been able to complete the review that would satisfy you. You can't in good conscience decide that it meets the requisites, and you deny it. You preserve your rights. What you've got then is action. That's the same thing as a denial without prejudice. Because if you deny and you say you haven't got us enough information, obviously implicit in that, even in Constitution pipeline, it was implicit that if you came in with the information that we needed, then we'd have to consider it. But my concern is obviously that the statute doesn't say a complete application or request or a valid — it doesn't use the language we find in other statutes. It just says upon the receipt of a request. Well, it is ambiguous. It's ambiguous in two ways. No, it is. A request for certification could mean either a complete request, as we contend, or an incomplete application, as FERC contends. We think it's more reasonably read as a complete application. Can I just stop there? Why is it so clear that that's the reasonable construction? Because it seems to me when you have this one-year bright-line rule that the statute on its face is saying we want to have the states participate in the review of these projects under the Clean Water Act, but we want there to be an end point, a definite end point. And your interpretation seems to unravel that completely by putting within the states' discretion — and New York's review here may have been very full and expeditious — but in essence, your interpretation puts in the hands of the states the power indefinitely to delay a project by deeming applications repeatedly to be incomplete. Or am I misunderstanding something? Well, requiring a complete application would not extend the review period indefinitely. I mean, first, the applicant can still go to FERC for a declaration that the state has waived its review. For instance, the applicant could maintain that its application was, in fact, complete. And if FERC agrees, then there's likely a waiver. And second, DEC's own regulations prevent inaction. They restrict the timing, content, and form of notices of incomplete application. So if you get an incomplete application, you have to tell them that it's incomplete within a certain amount of time. And in cases that don't involve natural gas, if we can step beyond the cordons of this case for a moment, the application — the applicant — and this was the legislative intent cited in our reply brief — the applicant can challenge a failure to act in state court. Under Article 78, CPLR 7803.1, you can challenge agency inaction. So it's not true that you would have an indefinite period. There are mechanisms in place to keep things moving. Mr. Brody, I've given you more than enough time, and I appreciate it. We very much appreciate your argument. Before you sit down, what remedy do you want from us? If you prevail here, where exactly does this litigation go, in your view? What happens next — to borrow a phrase from someone in one of the other arguments — what happens next is this Court finds there was no waiver. So then there was actually a denial that came down on August 30th — August 31st of last year. So then that denial comes up for review. Millennium has already challenged that denial. It's in No. 1734 — But in this case, what is it that you — if you were in our place, what would you do? What would be the decree to language, and what would be accomplished by any decree of ours? The — the credo language is that the FERC decision is vacated, and it's found that DEC did not waive its right to review. And then? And then, necessarily, because we said the application was complete as of August 31 — as of August 31, then our decision on August 30th was timely. And then? And then, No. 1734-65 opens up. We brief that, and we're back before the Court. Did DEC decide right on the merits? Okay. Thank you. Thank you, Your Honor. We'll hear from Ms. Elephant. Good morning, Your Honors. With one waiver, FERC made 6,000 public comments disappear. That's one of the forgotten issues at stake in this case. And the reason that that happened is because the Commission acted too late on the waiver. It's not the Department that acted too late. Did the individuals and residents and landowners have an opportunity or — did they exercise that opportunity to participate in the FERC proceedings? Could they have commented on the FERC environmental review and so on? Yes, absolutely, Your Honor. The residents did participate extensively in the Commission proceedings. They filed comments on issues related to water quality. But one of the problems was that the application had changed, which is one of the reasons why the Department found that the application was incomplete. So, for example, while the residents were able to comment on the impacts stated in the environmental assessment, they were not able to raise comments related to some of the changes that took place in the application as it evolved in front of DEC. And were there other areas of substantive interest that they were not entitled to comment on in their interactions with the FERC? No, Your Honor. The residents raised a host of issues. They raised Environmental Species Act violations, jurisdictional issues, the issue of whether FERC acted too late on the Clean Water Act. That was one of the problems with the timing of this case, and that's something that nobody here had control over, is that the residents had filed their petition for rehearing of the certificate order in December of 2016. The Commission actually came out with this waiver decision in September of 2017, and then it wasn't until the rehearing in November of 2017 that they proceeded on different tracks, whereas if some of these issues could have been decided earlier, it might have clarified some of these things in the proceeding for the citizens. So could you give a more concrete description of what kind of comment they were unable to make? Well, as I said, there were many issues that came up in the context of the Clean Water Act. So it would basically be related to... I'm talking about the change. You said there was a change, and so that they weren't able to comment. Yes. So many of those issues were raised in the public comments to the hearing, and there are some examples of what those comments are in the joint appendix. For example, there were additional issues related to the Endangered Species Act, the presence of the bald eagle, the impacts on the results of the survey for the bog turtles. So there were those issues that were impacts to wetlands, whether the proposed... what measures DEC was going to take in order to address issues like turbidity in the water, which is something that the Commission had said in its certificate that their finding of no impact was dependent on what the DEC would decide. So it revolves around those types of issues that they would have been able to go back into the Commission and raise. And the other thing they would have been able to do, had FERC waived the certificate, had they waived the 401 before the certificate issued, is they could have urged FERC to adopt some of those conditions, incorporate them into the license, into the certificate, notwithstanding the waiver. They would have had the opportunity to do that as well. And that's really one of the primary opportunities that they were denied, because if they had known the certificate was waived before, they could have gone back to FERC and said, look, these are water quality issues that came up. We had anticipated they would be addressed by DEC. And because they weren't, it's imperative that you include additional conditions in this certificate. The door is closed on their ability to do that. I see — oh, I still have some time. So that's one of the problems that arises from this post-certificate grant waiver. The statute is also very clear. The language of the statute refers to an applicant applying for a Section 401 certificate. And then towards the end of Section 401A1, the statute says that no federal license shall issue without a 401 certificate unless it's been waived or denied in respect to the previous sentence. And the previous sentence says that the certification is denied can be waived with respect to a federal application. Later on in the statute, in Section 401A5, there's a discussion in that provision about whether a state that's issued a certificate can later revise it once the federal license is issued. And that provision, 401A5, refers to a waiver with respect to a federal license, not a federal application. So the statute itself takes you through a progression of the process. In A1, you're still getting the certificate. There's provisions further down, you know, if the state issues the certificate but wants to change its mind. And there are very different terms used in the statute to describe those two events. And so we believe that the statute is also very clear on this issue. Now I do see my time has expired. Thank you. May it please the Court. Robert Solomon for the Federal Energy Regulatory Commission. I would like to start with the New York arguments. My commission's interpretation of the statutory language is faithful to the plain text of the statute and advances the legislative purpose, which is to avoid indefinite delay. But isn't part of the legislative purpose also to ensure meaningful state participation? And if a mere request is enough to trigger the review, the state's obligation to begin reviewing, where, I mean, there was material here, but this is a complicated matter. It's complicated environmentally. It's complicated from any number of points of view. Why does it further Congress's purpose to allow the state to participate to set a relatively short timeline and have it not tied to whether there was a meaningfully complete application? Well, it's a balance between meaningful state involvement and timely state involvement. And the commission is trying to give effect to the one-sentence waiver provision embedded in the middle of Section 401. We agree that the states have a vital role in Section 401 to ensure compliance with state water quality standards. But the waiver provision is not a grant of state authority. Rather, it is a limitation on state authority. And when it comes to that limitation, it is the responsibility of the Federal Energy Regulatory Commission to ensure that the state has comported itself with all of its responsibilities under the statute. Judge Carney, you are correct. The word complete does not appear in the statute. It's the commission's responsibility to give meaning to request for certification. And the commission's interpretation is that the Millennium application filed on November 23, 2015, was in fact a request for certification. In trying to give meaning to those words, instead of adding words to the statute as New York has done, the commission's task was to give meaning to requests for certification and provided dictionary definitions of application, receipt, and request. And all the commission has required is that there be an application for certification or a written application for certification. If the state of New York is concerned that the pipeline applicant has engaged in gaming or sandbagging, I have no reason to understand why any pipeline would want to do that. But if that is the concern of the state, the state, of course, can simply deny the application. The counsel for the state says that that actually isn't the case, that they are bound to act substantively in a denial. And he implies, I guess, that they would be subject to challenge for arbitrary and capricious activity if they were to deny what was maybe complete, but they only had 24 hours to look at. What's your response to that? Well, as Your Honor was suggesting, if in fact such an appeal were filed from a state denial, it probably would not be a difficult burden for the state to overcome arbitrary and capricious standard of review, as the state of New York successfully managed to do in the Constitution pipeline decision of this court from last year. But when it comes to waiver, as we know from the Millennium decision and Phase I of this litigation in the D.C. Circuit last year, and as we know from the Natural Gas Act, Section 15, 717N, subsections B and C, the Commission is the lead agency for purposes of coordinating all federal authorizations and sets schedules to ensure expeditious completion of all federal authorizations. Judge Livingston, you started the questioning with the question of standard of review. We believe that the Commission's interpretation is faithful to the plain and unambiguous text of the waiver provision of the statute. You don't get to the issue of deference unless this court were to make a finding of ambiguity. The Fourth Circuit found that the provision was ambiguous, right, in the Sparrows Point case. Do we have to decide in conflict with that, or if we were to follow your argument, or is Sparrows Point distinguishable? Sparrows Point is distinguishable. First, I'm not even sure how the Fourth Circuit even got to the issue, because as we know from the Constitution decision of this court last year, when it comes to the issue of delay, that is a matter that can only be heard by the D.C. Circuit, and we know that from Section 19D of the Natural Gas Act, 717R, subsection D, subsection 2. But we believe that the better cases, the ones that are more on point, are the Alcoa decision of the D.C. Circuit, and in particular, the Ninth Circuit decision in California, which addressed our 1987 regulation concerning hydroelectric licensing, and that regulation, which we are following here in the context of natural gas pipeline adjudications, provides for the one-year state review period to start after the written application by the applicant. And the Ninth Circuit said that our regulation, our position, which we are following here, is fully consistent with the letter and intent of the statute. The standard of review cases that New York cites, Turner v. Perales, Perry v. Dowling, City of Bangor, in all of those cases, either a federal agency was not involved, or, as in the case of Perry v. Dowling, the federal government actually blessed the state interpretation. I'm just looking at AES Sparrows, and I note that Judge Hamilton characterized the question, or as they were called on to review, the denial of a request for water quality certification, not the failure to act. And then they go on and find the statute ambiguous in this respect. So it seems to me that a decision that the statute was unambiguous would be in conflict with their ruling. Am I overlooking something? No, I don't think you're overlooking anything. The basis for the Fourth Circuit's decision in AES, of course, was because there was a federal agency involved, the Army Corps of Engineers, that had its own regulation under Section 404 of the Clean Water Act, and all the Fourth Circuit did in the AES case was to defer to the permissible reading of the Army Corps of its own regulation. Here, the Army Corps has filed a letter indicating that it takes no position whatsoever in this litigation. The Army Corps is not even supporting the New York position in this case, and for good reason, because the word complete, which New York is trying to add to the statute, is a subjective word, as New York concedes on the final two pages of its reply brief. That is a matter of regulatory judgment. New York makes the comparison between a complete application and a half of an apple on page 12 of its reply brief, but an apple or a half of an apple, those are objective, verifiable, measurable concepts, whereas a complete application, as the New York regulations themselves indicate, 621.2 of Title VI of the New York regulations, a complete application is whatever the State of New York deems to be a complete application for the purpose of commencing review, and the subjectivity and the elusiveness of the concept of complete, I think, is demonstrated by the facts of this case here. New York is now claiming that the application was complete as of August 31, 2016, but three months later, in the November 2016 letter that New York referred to on page 618 of the JA, the State of New York said that it was still determining whether, in fact, there is a valid application, and that the State has at a minimum until August 31, 2017. But it was reasonable of the State to say, listen, we want to get the commission's environmental impact assessment or statement before we rule. We're not going to duplicate that, and our own environmental process is preempted. So isn't that a very reasonable thing for them to want to have in hand before they rule? I think so, but by November 2016, the federal agency had already provided its NEPA environmental assessment. There is some matter of dispute between New York and the intervener as to whether, in fact, a NEPA document needs to be in the record before the State can definitively act. As Mr. Brody said, the State of New York didn't deem the application complete until July 2017, which is 11 months after what they now view the August 2016 application to be complete. And again, as we have explained in our orders and in our brief, the appropriate remedy under the statute is both obvious and effective. The State can just simply deny. We know from the Constitution case that the State can continue to work with the applicant. And these issues of policy might be genuine, but our task is to effectuate the language of the statute. And Judge Livingston, I think you referred to the waiver provision as providing a one-year bright-line rule. And I think that is absolutely correct, because the Congress, in enacting the waiver provision, they wanted the State to exercise its authority, its very vital authority, within a period of one year. If the State denies, there is no longer a request on receipt by the State, and the clock would start all over again. Well, Mr. Solomon, on that question, has the FERC not changed its interpretation of all of this in recent years? Well, 30 years ago, we adopted our hydroelectric regulations. Prior to 1987, we had a different view, and we believe... 1987. Right. And since then, you feel it's been a uniform policy. It has been a uniform policy, and in fact... It hasn't changed because of recent changes of administration. It has not. In fact, the commission orders recognize that this has been the consistent approach for the last 30 years with respect to our licensing of hydroelectric projects. And on the natural gas side, even though we're acting case-by-case as opposed to through generic rulemaking, we have had this position for at least the last 12 years. On the question of completeness, let me just draw your attention to the intervener's brief at page 30. How would you respond to the fact that the EPA's handbook, Section 401, says that the review time frame begins once a certification has been made, and I quote, accompanied by a complete application? The EPA handbook articulates just the views of staff as opposed to the agency itself. It has no legal weight as far as you're concerned. It has no legal weight, but I believe the handbook also says that it's for the commission itself to determine timeliness, not the state, which makes sense because that comports entirely with the waiver provision being something that the FERC, as opposed to the state, actually administers. And if there is any deference to be afforded to any agency, whether it's Chevron or Skidmore or something else, when it comes to the waiver provision, that is not a section that the state implements and effectuates. That is the responsibility of the federal government. Let me ask you the same question I asked Mr. Brody at a very mundane level. Let's assume for the sake of argument that Mr. Brody and the interveners prevail here. What exactly do you think is the effect of such a disposition on not only the litigation, but whatever is going on in the real world? I think the effect would be that, well, one, there would be the issue of whether the matter would be remanded back to my agency or just vacated. There is another appeal filed by Millennium of the state denial in 3465. And if the commission is upheld and the waiver is affirmed, then you have the case concerning the certificate orders themselves, which is filed by the intervener landowner group in 3966, which provides a nice segue. The landowner group has raised a number of issues. We've indicated various — What's the status? Can you just tell us what the status is of 3966 and 3645? I believe 3465 is an abeyance waiting resolution of this case. I'll allow my intervener to speak more on that topic. With respect to 3966, that was a petition for review that was filed in early December, immediately after the stay was extinguished in this case, 3770. And that case has not started briefing on the merits yet. And as was discussed with respect to Ms. Elephant's argument, all of those issues are better suited for review of the certificate orders. Those are the orders where we addressed not just simply the jurisdiction of my agency under the Natural Gas Act, but all of these other issues concerning water quality and endangered species and NEPA segmentation and the like. I want to draw the distinction between our jurisdictional arguments and our jurisprudential arguments with respect to two of the three arguments being raised by the intervener group, the timeliness of commission decision-making, their argument that our waiver order was too late, and their argument that, in fact, New York did act within the meaning of Section 401. Those are issues that were not presented to my agency on rehearing of the waiver decision. And that, in fact, is a flat-out jurisdictional bar to appellate review. Under the Natural Gas Act, 15 U.S.C. 717 R, subsection B, those issues have to be presented with particularity so the commission can address those issues so that the appellate court can act as a true appellate court. With respect to the arguments concerning whether interveners can raise issues that the petitioners themselves did not raise, that is more of a prudential matter. I do want to point out that the jurisdictional issue that they raise has ramifications, if they were to be successful, far beyond this particular case. And from a prudential perspective, the jurisdictional issue was not injected into this case until the December 22 filing right before Christmas in an expedited case where the answering briefs were due January 11th. I assume other pipelines, other potential interveners and amicus participants would also want to be heard if, in fact, this court were to entertain the jurisdictional issue. Thank you very much. And I'll be giving Mr. Berdy some extra time on rebuttal to catch up with you. Thank you, Your Honor. Don't think that we're just letting one side go. All right, Ms. Stetson. Good afternoon, Your Honors. I want to make just three quick points, if I could, without going over any old ground. The first on bright lines, the second on Judge Carney, what you called calamities, and then the third on your deference and AES Sparrow's point. Judge Livingston, this statute does establish a bright line, and the FERC thesis is equally bright line, which is a statutory clock that runs from receipt of an application, runs from receipt of an application. And I reiterate this because even the DEC, in its first letter to Millennium on December 7th of 2015, you'll find this at Joint Appendix 128, the DEC in that letter says, on November 23rd, 2015, we received your application for a water quality certification. Now, Judge Carney, you asked Mr. Solomon the question about meaningful participation. That's why there is the one year permitted. There is simply no credible argument that there wasn't meaningful participation here. The DEC submitted extensive comments to FERC in December of 2015, March of 2016, June of 2016, after the EA, and even after that environmental assessment came out in early May. What about the intervener's comment that there were 6,000 comments that were, whose consideration was precluded because of the sequence of events here? I think that is somewhat of an overstatement, Your Honor. The interveners, or at least some of them, did fully participate in the FERC proceeding. And more to the point, DEC's own comments resulted in, as the Commission said, both in its certificate order and the rehearing order, significant modifications. And you can see that at Joint Appendix 557 and 779. And I think part of the argument was that they were precluded also from commenting on the revised plan, you know, after the project had been modified, possibly in response to some of the earlier comments. The revisions that were submitted to FERC and to the DEC after the May 2016 environmental assessment permitted time for further commentary there as well. On your calamities question, if I could, a pipeline applicant has precisely zero incentive to game the system in the way that Mr. Brody is hypothesizing. Because if a pipeline applicant, which is sophisticated and knows how these things work, if that applicant were to do something along the lines of Mr. Brody was suggesting, texting an application, filing a blank, it would get denied. And it might get denied with prejudice. And the pipeline applicant, I would venture, would have a steep uphill battle convincing this court, or any court, that that decision was somehow an abuse of the DEC's discretion. The gamesmanship, to the extent there was, unfortunately in this case, occurred with the way that the DEC went about treating the application, for the reason that Mr. Solomon mentioned, those long lags of time in between responses. And then the backward looking July 7th, 2017, notice that in fact, Millennium's application was complete back in August. One last point on deference on AES Sparrows. Arguably this court has already created a split with AES Sparrows for the reason that Mr. Solomon adverted to. That court purported to exercise jurisdiction over a waiver argument. Also in the context of a- It was, but that was exactly the same thing in Constitution. The same arguments were made. It was a denial there, and they argued waiver. And the Court of Appeals in the Fourth Circuit took jurisdiction over that question and answered it. The Second Circuit, in the same context, denial argument of waiver, decided that it did not have jurisdiction over that question. But more to the point, the way I think to reconcile AES Sparrows in this case is two ways, really. The first is, you can't bind yourself, I think, to a single decision of another court in a circumstance where multiple agencies are interpreting a statute. Because otherwise, the first agency and the first court to reach that question would somehow dictate the answer to that question. But more substantively, the Fourth Circuit, when it decided that the core's interpretation was appropriate, it said, we're going to find this ambiguous, albeit in a sentence. We're going to defer to the core's interpretation because the core is the agency charged with administering the 404 permit. If you analogize to this case, and if you accommodate that one line finding that the statute was ambiguous in AES Sparrows, which I don't think you need to do, I think it's pretty clear, then the analogous situation is that you would accord some deference, even if not full Chevron deference, to FERC. Because FERC is the entity that is specifically charged with making the waiver determination. That, I think, is how you reconcile those two decisions. If there are no further questions. Can you tell us something about what's going on in the real world on the ground? What is happening with this pipeline at this moment? At this moment, my understanding, and there are regular filings that go into the FERC docket that update progress. The most recent filing said that most or all of the tree felling is complete. I think the next phase will be the laying of the pipeline. My understanding is that CPV is expected to start testing its facility next month or the month after that. And what's your view on what would happen if the petitioners prevail here? What is it that, in your view, what's the procedural posture in which we would find ourselves? I think I agree. I think I heard both Mr. Brody and Mr. Solomon say the next step, if the petitioners and interveners prevail here, that would mean that FERC's waiver determination was essentially, would be vacated. That, in turn, would sort of reinvigorate the department's August 31, 2017, denial. That has been held in abeyance pending this case. So that case would then proceed to briefing and argument.  Thank you, Your Honor. You were good enough to cite Joint Appendix 657. And after going through the pile of the appendix, I've come to JA657. And what is it that I'm supposed to understand? I believe, that may have been my mistake, Your Honor, 557. 557 is the point in the certificate order where FERC points out that, in response to the DEC's comments that were submitted in December of 2015, March and June of 2016, that Millennium made significant changes to the method that it was using to develop the pipeline crossings and to other environmental mitigation conditions that it put in place. So 557. Thanks very much. Thank you, Your Honor. All right, Mr. Brody. Let's give Mr. Brody, instead of one minute, let's give him four minutes. Thank you, Your Honor. Mr. Solomon says that he is given a dictionary definition of receipt. And, indeed, he has. A receipt is the act or process of receiving. And we agree with that. Receipt can be a process. Here, the process starts when you get that initial application. But it continues until the application is complete. Mr. Solomon asks, why would a pipeline company sandbag? And Ms. Stetson asks the same thing. Two reasons. One, you avoid public notice and comment. Two, you avoid substantive review by the DEC. Instead, the whole record goes up to a court. And the court has to decide, well, was the record enough? And maybe the court is not going to have environmental experts there who are going to give the record as searching a review as DEC does. With respect to Alcoa and the Ninth Circuit California case that were cited by Mr. Solomon, neither of those decisions discusses when, under the terms of the statute, not under the terms of an implementing regulation, under the terms of a statute, the period, the one-year period starts. And it's important, the distinction between a statute and implementing regulation. The reason you have implementing regulations here is that the statute is ambiguous. Mr. Solomon says that the ‑‑ You're saying that any statute that has implementing regulations is thereby demonstrated to have been ambiguous? No. But in this case, certainly with that 1987 implementation by FERC, they decided, well, look, previously we said that the period for hydro projects begins when the State Senate did. Now we're going to change our view. Now, was the first view impermissible? No. Both views fell within the ambiguous language of the statute. Mr. Solomon is incorrect to say ‑‑ You're saying that because there was ‑‑ the agency itself changed its interpretation, although a very long time ago, as these things go, that that underscores the fact that there's more than one interpretation possible for this language? Precisely. And as does the Fourth Circuit's opinion. That's why we're citing it, AES Sparrows, because they say, look, it's ambiguous. It doesn't tell us when the period starts. It tells us when the period ends, but not when the period starts. One moment, Your Honor. And with respect to deference, even under Chevron deference, and we've got our arguments in the brief, but even if you gave FERC Chevron deference, to which they're not entitled, even under Chevron, 467 U.S. at 845, that case says that if the interpretation is not what Congress would have intended, the court should reject it. So Chevron deference is not an automatic win for FERC. Here, Congress definitely says in the statute they want public notice. They definitely say in the statute that they want substantive State input on does this project comply with the State's water quality standards. And although Ms. Stetson is correct that we gave substantive input, we were not able to answer the crucial question that that statute puts on our shoulders. Does this project comply with State water quality standards? Thank you, Your Honors. Thank you, Mr. Brody. We are adjourned. And we'll take it under submission. Thank you. Court is adjourned.